Good morning and may it please the court, Matthew Brown representing Turo and I'd like to reserve three minutes for a rebuttal. As the court knows, Turo is a peer-to-peer car sharing platform and the city has asserted claims against Turo because certain users of the platform have listed their cars there and indicated their willingness to deliver those cars to LAX. And because hosts and guests in the Turo lingo have used the tools on the site to arrange car handoffs at LAX. It's undisputed that all of that content originates with the third-party users on the site, not Turo. And Turo does not attempt to control where car handoffs happen. In fact, Turo does not require hosts to do deliveries at all. They can simply do pickups at their home location. So basically you're in the home away category, correct? No, that's not correct. Let me just take a minute to try to address that. We've spent a lot of room in the briefing addressing it, but let me see if I can do it concisely here. You're claiming 230. You're saying that you're entitled to protection under 230, which in my view would put you in the home away. You either have to distinguish home away or if home away is controlling, then the district court got it right. So you've got that. And that's not an argument that the Quan defendants have. You're the only one that has that. That's correct. And obviously there's a huge body of CDA 230 case law out there to start with the home away decision. The issue there was that the city of Santa Monica had a particular ordinance that said any homeowners that wanted to engage in short term rentals needed to sign up on a registry with the city. And then it also had a provision in the ordinance that directly regulated what the ordinance called booking. So Airbnb or home away. And so the theory of liability that was at issue there was one that directly regulated those booking agents and prohibited them from processing transactions. And therefore, in that case, home away and Airbnb didn't need to worry about the listings themselves. In fact, the ordinance had a safe harbor that said, if you comply with this regulation, which is the prohibition on processing these transactions, you've got a safe harbor. So you don't need to worry about the fact that there is a content on the site here. The claims that are an issue are all have to do with essentially on unauthorized activity on LAX property. But home away seems to draw a pretty clear line saying that under 230, a company can be held liable for processing an illegal transaction, even if it may not be held liable for content that is uploaded by third parties. So I don't know why that doesn't foreclosure argument for total immunity here. You are processing things, you offer insurance, you do, you know. Yeah, well, that's because the analysis in that case had to deal with the claim that was at issue. And every CDA 230 case has to start with that. You have to look at the claim that's being asserted in the theory of liability, stripping away any attempts to skirt immunity through artful pleading. And there there was a specific ordinance that regulated booking. It went directly to that. Here there is no such regulation, nor could there be. Because under the enabling statute for the airport, California government code 50474 subsection F. The airport only has the regulatory authority for things that happen on airport property or I think the languages within or over the airport. And so what you've got here are essentially trespass related claims in the essential published content to use the lingo of CDA 230 are the hosts listings indicating LAX is a delivery location. The essential published content is third party content. And the only way that Turo under the government's theory can be liable here is as the publisher of that content. And, you know, the Barnes versus Yahoo case in this circuit said that any activity that can on a website's part that can essentially be boiled down to making a decision about whether to exclude content or not exclude content is perforce immune under section 230. This is really a case that's core section 230 as opposed to the opposite. In the dire off case by this circuit in 2019, which was a post home away case, actually think the facts there are quite analogous. And I'd like to take just a minute if I could to try to tease a few of those out. Some of the factual detail is located in the district court opinion rather than the this court's opinion. But you remember in dire off, there's the website, the experience project that allowed people to join groups and have conversations about things. And the experience project essentially ran algorithms that analyze people's posts and analyzed other user characteristics and tried to figure out what would interest them, what their emotional state was. In that case, you had a recovering a drug addict who was essentially steered into a group relating to heroin. When I say steered, what happened is the experience project literally put up a recommendation, text on the screen saying, we think you'd be interested in this heroin related group. He went to that group, he had to buy a token from the website in order to post the question. So they were trying to monetize the site in that way. And he posted the question, where can I score heroin in Jacksonville, Florida? Not subtle. The website then blasted that question out to everybody in the group. And then when the drug dealer who was monitoring the content on the group responded to that question, the website then created an email that sent to Greer, the decedent, and said, someone has responded to the question, where can I score heroin in Jacksonville, Florida? And provided a link to that response. Unfortunately, a drug deal did end up happening and Greer died from a fentanyl overdose. But the important thing is that the court said, even though there were these sort of suggestions created by the website, even though there was this email created by the website, that doesn't turn the website into something other than a publisher. It doesn't mean that the website has created the content that matters in the case. In fact, if you want to call it content, what you should really view it as through the CD community lens is not content at all, but rather website features and tools that users can take advantage of to communicate with each other. And essentially here what we have is the city trying to point to facets of the website, like offering for third party insurance coverage, or offering payment processing, having detailed policies about how the trips are supposed to take place. I know you talk about a lot of this in your briefing, so there's a couple of things that, because we have limited time that I want to talk about, so I'm going to direct you to where I think some of... To me, and I'm not speaking for my colleagues here, because we haven't talked about the case or anything, so I have no idea, but one area that I had interest in was on the irreparable harm. And I think both you and the hard defendants, or whatever, I'm sure, I can't remember exactly what I should call them, but anyway... Post defendants, possibly. The what? Post defendants. The post defendants, yes. The evidence in the record is that just that there's 30,000 drop-offs, but there's more than that, but just of certain amounts, and you put in evidence that your people are responsible for 127, and that it's de minimis somehow. So, if we were to, you know, that part of, if we agreed that, I guess that would be for clear error on that part of it, because it was a finding of irreparable harm, I guess, and part of the overall abuse of discretion. If we said that irreparable harm was not shown, then that upends the injunction, correct? It certainly would, and if you want me to address congestion... Well, it's just that the thing is, though, but then there seemed to be, I don't know, it was an amicus or something, but I'm not sure if they were arguing that if you put one car there, that that would be irreparable harm. I don't know where their standard was, but they said 127 or whatever, so that was one place that I think also I had a question about whether on the breadth of the injunction, and I think that would be regarding Turo in terms of if, let's assume that you could be held liable for processing car rental transaction where the vehicle is scheduled to be picked up at the airport. Would you continue to contend the injunction is still overbroad in that incidence, or how, or where do you say it's overbroad? And then I think you're also saying if it's mandatory as opposed to you, which I don't think, I don't see that argument as persuasive as much as to the host defendant, but if it's mandatory, then the wrong standard was not, was applied, correct? Is that... Those to me are your stronger arguments why the injunction might need to be vacated, and that's, I guess, I want to put that out there, and I'm sure LA will respond. Let's start with irreparable harm then, and we'll assume for just a moment that irreparable harm is kind of the standard irreparable harm standard, not the higher standard that would be required if this were deemed to be a mandatory injunction, which we think it is as to Turo. But even on the regular irreparable harm standard, the evidence in the record simply does not support that there's any congestion impact whatsoever. The only congestion evidence was put in by Turo, and we had an expert who's a University of Virginia professor and one of the leading experts in congestion analysis in the country. And he did a sophisticated analysis that's laid out in his declaration and concluded that the impact of these 120 or so trips per day is immaterial and unnoticeable. That's the evidence in the record, and it makes sense because additionally in the record are the facts that every single day at LAX there are literally 96,000 cars coming onto the airport property, 33,000 of which are Turos, excuse me, Ubers and Lyfts and taxis and limos. And the city, by the way, is not contending that Ubers and Lyfts and taxis and limos, those 33,000 cars a day are creating an intolerable congestion impact. They're fine with those cars coming onto the airport as long as they get their fee. And that kind of leads into, and so that's the only congestion evidence that's in the record. On the other side of the ledger, the city simply asserts in the most generalized and conclusory way in the counterclaims that there's a congestion impact. And then they've submitted a declaration from a management analyst at the airport who simply says in literally a single sentence, yeah, all the allegations in the complaint are true. And how do we know they're true? Well, some of them are based on my own personal knowledge. Some of them are based on other employees at the airport, the identities of whom are unknown. And some of the facts I've gotten from the lawyers for the city. So on that record, when you've got really the only credible congestion evidence from Turo and what's essentially non-evidenced by the city, there's literally no support for there being a congestion impact. And I would suggest that there's a reason why the city didn't bring a motion for preliminary injunction for some three years after it became aware of this activity. Further, let me go back to the mandatory injunction point then. Turo has never attempted to control where users hand off their cars. And so in order to… Isn't the latter not a mandatory injunction, the latter part of that? Maybe you're misunderstanding my question. Why is the portion of the injunction which says you may no longer process transactions relating to LAX, why is that a mandatory injunction? Why is it subject to a higher standard? I understand the question now. I apologize. Well, in the case law, courts have often said that you can't look at the language alone because you can often characterize an injunction in seemingly prohibitory terms. But you've got to look at what it would really require. And here, it would require and did require, in fact, Turo to take affirmative action to redesign its website, something it had never done before. And it had to deploy engineering teams and finance teams and customer service teams to do it. And it had to do two different things. It first had to literally remove content on the site that was already existing content so that it no longer… basically had to strip users' listings of any reference to the LAX. And then prospectively, it had to change the way the website operated so that that would be excluded or blocked in the future. So it was really sort of two different aspects that required affirmative conduct. And under this circuit's precedent regarding mandatory injunctions, it seemed to me clearly complies. And of course, if that's the case, then there are both higher standards for the merits prong of the… it's no longer likelihood of success, but it's got to be… I think the standard is that you've got to make it clear, showing that both the law and the facts are in your favor. And then in terms of irreparable harm, it's a showing, I think, of extreme damage. I may be getting slightly wrong, but there are sort of elevated standards on both of those prongs. But of course, our argument is because of the CDA 230 immunity, there was no likelihood of success on the merits at all, nor should the motion to dismiss been denied. In fact, it should have been granted and the court should have found that we had CDA 230 immunity and the counterclaim should have been dismissed. I think we understand that part of your argument. So let me ask my colleagues. I've taken them over already, but we have questions. And it's a fairly complicated case. So if either of you have any additional questions on this part of it, please feel free to ask. Okay, we went two and a half minutes over. I'll give you two minutes for rebuttal because I'm such a nice person. But I think that would be… but we had to have those questions answered and clarified. So, all right. So now we'll move to… I probably mispronounced your name, but go ahead, Ms. Pabian. Hi, I'm Eileen Pabian of Holland and Knight on behalf of the appellants, Eric Kwan, Andre Smulevitz, and Andre Kornikov, who I will refer to today as the hosts. I'd like to reserve one minute of my time for rebuttal. Judge Callahan, as you pointed out, given the time constraints that I have, I was planning on really relying heavily on our briefs and focusing the court on what we consider to be the most egregious aspects of the court's injunction order, which, as you pointed out, is the finding on irreparable harm. The district court here found that… erroneously found that the city will be irreparably harmed without an injunction. Irreparable harm has to be proven. It cannot be presumed. And it has to be proven by a clear showing of evidence. The city did not even try to present any evidence of harm. They believe that they didn't need to. And in reality, there is no evidence of irreparable harm. Well, I would concede to you, and I'm not speaking for anyone, but if I were just the trier of fact, I would say, whoa, that's a pretty slim read. Okay. But I'm reviewing on a more deferential standard. And so my concern always is, if you're asking me to reweigh evidence and the district court saw it a different way, then I, you know, I don't want to take, you know, I don't want to take my appellate hat off and be a district judge. So that's my concern here on, is there an, you know, how, how can I still be an appellate judge and say there's no irreparable harm or that, what, what would I have to find? What's the legal path? Okay, well, we're looking, the standard review here is abusive discretion. And either if the judge applied an erroneous legal standard or had a clearly erroneous assessment of the evidence, that constitutes an abusive discretion. So first of all, we argued that the judge here actually applied an erroneous presumption of irreparable harm. She took the position that any impact of a trespass here amounts to irreparable harm. I wanted to read to you the exact language that she used. She said, because the host activities were, quote, impacting traffic flow at LAX, at least to some degree, that injury and the resulting trespass against the city's property rights is not compensable at law and is sufficient to establish irreparable harm. Thus, the court presumed that any impact of a trespass, no matter how negligible it is, constitutes, automatically constitutes irreparable harm. And we know that can't be the case because irreparable harm means something, a harm that's real and significant. Some indeterminate amount of harm based on the amount of impact on traffic flow does not rise to this level. So it's not irreparable harm. And without this presumption, as Mr. Brown pointed out, there is no evidence in the record to support a finding of harm. The court's analysis here is contained of the showing of irreparable harm is contained in one short paragraph on page 28 of the host record excerpts. And essentially, as he pointed out. So forgive me for interrupting this. Ultimately, this is a form of trespass. And so are you saying that if my neighbor keeps trespassing on my property? And I keep telling him, don't do that. But it's not causing me any economic harm. It's just that I don't want my neighbor crossing onto my property, that I'm not entitled to get an injunction saying you must stop going on my property. The only way, even in cases of trespasses to real property, the law provides that a movement has to show irreparable harm. It has to be a clear showing of irreparable harm. This is a drastic and extraordinary remedy. It's not awarded as a right. And under your scenario, and the way the court interpreted it, if any impact on property, any entry on land would cause irreparable harm, that would do away with the requirement of actually having to make a showing. The city did not make any showing whatsoever. The city relied on its allegations, some allegations and its counterclaims that were backed up by a two-sentence declaration of an airport employee. And those allegations were directly contradicted by the only congestion-related evidence in the record, which was from Dr. Park, who attested, after doing an entire analysis, that all of Toro Losers' handoffs at the airport, all of them, represented such a negligible amount of impact on the entire traffic flow there that they were, quote, immaterial and essentially unnoticeable. It amounted to 0.13%. All of Toro Losers' handoffs amounted to 0.13% of LAX's daily total traffic volume. If all of the Toro Losers' handoffs were, if they were statistically immaterial, then surely these three individual hosts, the impact that they were having, could hardly be deemed to be irreparable. Okay, I guess, I guess that, just so that I understand this, so, and you claim irreparable harm because you're losing all this money and you can't do your businesses and you can't do all that. But, in that part of the analysis, when you balance the equities, we would be able to consider that if you're trespassing or you're not, or you're violating the law or you need a permit, that goes into the balance of the equities, does it not? Well, the balance of harms, you're correct. The balance of harms, you are supposed to look at, you know, which, which, which outweighs the other. But in this case, the district court utilized its erroneous findings on the first two prongs and basically said, because they're doing something wrong, the hosts in Toro are doing something wrong, they can't possibly have any say. They can't possibly argue that their harm somehow outweighs the city's. So, essentially, we're left with a factual finding by the court or a finding of irreparable harm that is premised on an erroneous legal standard and a clearly erroneous assessment of the evidence. The city did not establish its entitlement to this injunction. And because of that, we asked the court to, to reverse this injunction against the hosts. I'll give you one. Go ahead, Judge Walker. One very small factual question. I was hoping you could clarify. How have the parties interpreted this injunction? Is it just to prohibit the driving of the car and doing the car exchange on LAX property? Or is it also extending to, like, you can't go and pick the person up and have the car exchange occur off-site? It's the host's position that the only thing that is enjoined is vehicle handoffs, which, as you point out, if you look at the language of the injunction itself, it says vehicle handoffs. The city has, you know, taken the position on appeal that if there was something more than that, that it now somehow prohibits us from even picking up guests there, the host from picking up guests there. But the injunction itself says nothing about that. The only conduct that was enjoined is vehicle handoffs. Okay. So there's no consensus among you all as to what exactly this injunction covers? No, there isn't. Okay. Thank you. So if we said it was vague in any way, we couldn't even really correct it because you all don't agree on what's, so it would have to go back to the district court to clarify on that. Is that correct? In our position, it's not vague. It's the, the language is pretty clear. It says the judge defined vehicle handoffs in the decretal portion and said exactly what they were. And then it's specified that Turo can't engage, allow for any vehicle handoffs to take place, and the hosts are not allowed to conduct any vehicle handoffs. So we, we, we believe the injunction is pretty clear. It, it only enjoins vehicle handoffs. There's not, there's no language in there indicating anything otherwise. The court's entire analysis focuses on vehicle handoffs, if you look at the order. But LAX is interpreting it differently. At this point, because the reason why they're interpreting it differently is because there's no evidence, they didn't present any evidence that the hosts are actually engaging in vehicle handoffs. So now on appeal, they were trying to take the position that this really enjoined something more than just vehicle handoffs. So that's the reason why all of a sudden things don't, you know, in their opinion are a little murky, but all along throughout this litigation, the only thing that the court focused on and the only thing the parties were litigating is vehicle handoffs. Okay, thank you. We're obviously going over, but that's fine because we have questions. So I'll give you one minute for rebuttal. All right, let's then go to the city. Good morning, your honors. My name is David McKee and I represent the appellee, the city of Los Angeles. I'll, I'll start with the Communications Decency Act, the CDA. The district court correctly concluded that the CDA does not apply here. In fact, the district court correctly concluded it really wasn't a very close call. This court's decision in Homoi is directly on point. The city's claims don't treat Turo as a publisher of third party content. That's really what the CDA immunizes. Instead, the city's claims seek to impose liability on Turo as an active participant and enabler of the illegal car rental transactions at LAX. Turo has reservations for rental vehicles at LAX. It provides payments. It provides a million dollars of insurance to vehicle owners. It provides roadside assistance. It provides emergency support, excuse me, all for rentals at LAX. There were 45,000 Turo-enabled rentals at LAX in 2018 alone. That's the conduct that the city wants to stop. To provide some context, your honors, the, this court's CDA cases are on a spectrum. And at one end, you have, you know, the classic bulletin board cases, the social media platforms like the Experience Project and the Dyer-Roth case that my brother, Mr. Brown, was describing. You've got matchmaker.com, which is the Caracano case. You've also got, you know, backpage.com, which is the First Circuit's opinion that Turo's sites threw out. You know, this court has described, in the Dyer-Roth case, for example, bulletin boards as the prototypical service qualifying for CDA immunity. These cases, these prototypical cases, are all about publishing third-party content. The, at the other end, there's another end of the CDA spectrum, bulletin board cases like Dyer-Roth, where you have the vacation rental platforms like Airbnb, where, for sure, there's posting of third-party content in those cases, but there's this additional active involvement in the underlying transaction that is simply not subject to CDA immunity. Turo is, in fact, the Airbnb of recognition, and this court's opinion about Airbnb immunity in the HomeAway decision is controlling. And, in fact, for reasons I'm going to describe in a minute, Turo is even farther off the CDA spectrum than Airbnb, and that's when the district court concluded that there weren't really any grounds for difference of opinion on the issue. But doesn't, if doesn't, the district court suggested that Turo was required to affirmatively prevent users from posting LAX rentals on Turo's website run afoul of the holding in HomeAway.com, which held that internet platforms, in that case, could leave the postings up so long as the companies didn't process any bookings. But the district court seems to say, kind of, say, well, no, you can't leave them up very long. No, Your Honor, we do not read the injunction that way. What it says is that Turo's law permits users to use the platform to arrange legal handoffs. So, it goes to the point that, much like the city of Santa Monica and the HomeAway case, the city doesn't really care very much. But didn't the district court say they could only leave the listings up so long so that companies didn't process any bookings? No, it did not. It doesn't say that at all? No, Your Honor. There are absolutely different ways in which Turo could comply with this injunction. One of it, you know, it could voluntarily… I'm asking you what the district court said. The district court didn't say what I just said. No, Your Honor, I don't believe that it did. I'm sure Mr. Brown will disagree with you if there's any basis for that. So, make sure I'm not misreading something. The important point here is that what the court enjoined is the host or Turo from using its platform to facilitate the third-party transactions. Now, one of the ways Turo could voluntarily comply with that obligation is to, you know, not have those listings on its site. On the other hand, Turo could leave the third-party listings on the site that provided for pickup at LAX, but Turo could not process those transactions. And what the HomeAway decision says, Your Honor, is that if Turo decides from a business perspective that it doesn't want to leave listings on its website that it can't process or can't book and it decides to take them down, that probably is sound from a business perspective. It's probably what Turo would do or HomeAway did in that case. But that's their choice, and that choice doesn't implicate the CDA. How would Turo know where the handoff, in fact, took place? Because it would be evident in their own internal data where the transaction had been booked. Now, we fully acknowledge, Your Honor, and Turo has made this point that, you know, it's entirely possible that somebody could book the reservation on the Turo website as the pickup handoff location at LAX, and then the owner and the customer could, you know, communicate offline and say, hey, hey, hey, even though we're not supposed to, that's where we're going to meet. You know, Turo would not be responsible in those circumstances if this happens outside the Turo platform. But what Turo can't do here is facilitate bookings that list LAX as the drop-off point. Well, can you just speak to the point I asked Ms. Pabian? The breadth of the injunction, does it, in your view, extend to the arrangement where they say, well, we have the car about a mile away. It's off LAX property. We'll just come and get you, take you to the car. Do you think that's prohibited by the injunction as well? Ms. Pabian says there's nowhere in the district court's analysis whatsoever that addresses the transportation of customers back and forth from the airport to a remote lot where they pick up cars. But, in fact, there is. Twenty-four and twenty-five of the district court decisions focus and analyze Mr. Kwan's business activity, which, Your Honor, is the unresettled transporting customers back and forth between LAX and his remote vehicle storage facility. And she, you know, very plainly has that as a premier example of the ways in which the city's claim to, you know, have a break on the merits. So that's absolutely part of the illegal conduct here. Now, if there is ambiguity, we understand that Mr. Kwan, by the way, has stopped his shuttle bus operation, apparently interpreting the injunction to cover him. If there is ambiguity about that, that's something that we could raise in front of the district court. But there's certainly no ambiguity about the fact that vehicle handoffs take place at LAX. That's crystal clear. Could you, if you don't have more to say on Section 230, could you turn to the irreparable harm issue? Like Judge Callahan, that's what I'm most troubled about, I think, with respect to this injunction. Okay. Yes, of course, Your Honor. So the first thing I want to say is that both Thoreau and the hosts argue in their brief that the district court erroneously applied a presumption of irreparable harm.  The district court specifically acknowledged that the city was required to demonstrate irreparable harm. And then the district court also specifically found that the city had made that show here. Well, but I guess if, let's say there was only one car, it seems like almost that what you presented was it's the parking place and one would be enough to be irreparable harm. And that just can't, I don't know, that just seems like it can't be right. And 127, when you're looking at 30,000 plus, and that doesn't even count all the drop-offs and all of that, it's hard to see how anyone that's been to LAX, 127 seems nothing. Well, Your Honor, what the district court concluded was that traffic at LAX and before the pandemic was terribly congested and that the problem was getting worse for a variety of circumstances. Sure, it's bad, but do you have to tie it to these appellants? Or can you just say it's the traffic's bad and one more car that doesn't belong there is irreparable harm? Well, Your Honor, in context, in 2018, there were about 45,000 Turo-enabled handoffs. In 2019, it apparently doubled, so it was twice that now. You know, even so, given those numbers, Turo argues that its impact was de minimis relative to all the other cars at LAX. But the problem here, the airport's perspective, and why this is irreparable, is that there are hundreds of businesses, including ground transportation providers that operate at LAX. And the ACI, the amicus brief from the Airport Council International said this very well. Hundreds of businesses that operate at LAX occupy the road at LAX. And each of these businesses could probably argue that in isolation, its impact is very small. But if the court applied a de minimis threshold, then it would obviously eviscerate the city's interest in exercising effective control over its airport because each individual that it tried to stop from violating its plan. But the difference, all those people have permits, right? All those people have permits, right? That's the difference. So if they had permits, but irreparable harm is separate from that. I mean, it's got to be, so if you have a permit, then per se, I mean, the irreparable harm is if you don't have an injunction, basically you still got a trial and you could require them to have a permit, correct? And you can win on that. You can win on that. But the irreparable harm finding that is here means they can't do any business at all until you prove that they have to have a permit. Am I right? Your Honor, we need to show that we've got a likelihood of success on the merits. And we've done that in the district court we submit. And then we need to show irreparable harm. But if you can't show, if we pull out irreparable harm, that upends the whole injunction, does it not? We cannot get an injunction unless we make some showing of irreparable harm. Okay, that's what, okay, so we have to, so what's your evidence here? What's the evidence? The evidence is irreparable harm. And as I say, first of all, their activity at the airport is not deemed in a substantial and aggravated traffic conditions, according to the judge. It would also directly and irreparably harm the city's ability to exercise effective regulatory control over the airport if, with respect to everybody who's violating its GTU regulations, the city had to endure for years before it could put a stop to it. The harm to the city's interest here, its ability to control congestion at the airport, is not something that's in any way compensable in money damages. That's the key here. There's no way that Truro could compensate the city after the fact for the impact that it's having on traffic today. The fact that you didn't do anything for three years, is that part of the evidence that can be considered for irreparable harm? No, it's not, Your Honor, and it's a point that's worth pausing on, because what the city saw here was a business that it became aware of back in 2016, and it was much smaller then. And the city's entitled to make an informed decision about what point is that business moving to the point where it poses a very direct threat to the city's ability to control congestion on the central terminal area roadway. It waited, and as the record reflects, Truro's business doubled year after year, and it became a significant threat. And at some point, the city has to make an informed judgment that we need to put a stop to this now. That's what I'm hearing you say, though, and I may not dispute the fact that the city has the right to control congestion, but if I agree with that, does that automatically jump to irreparable harm? Are you saying the fact that you have the right to control congestion, ergo, any congestion is irreparable harm? It is, Your Honor, when viewed in the context of the fact that these are one of hundreds of people driving on the roadway, and that if the city is unable to control that illegal conduct, it may be able to control other unlawful conduct, and it loses the ability and control. It can't wait for years and years to hear a lawsuit. So I'm not wrong saying that your argument that you've shown irreparable harm is based on the fact that you have an absolute right to control congestion, and anyone that causes any congestion causes irreparable harm. That's one part of the argument, and if I might, if I could turn to Judge Rakoff's question about trespass, because the court made it clear it was aggravation of the traffic condition at LAX, but it's also, the court identified distinctly, harm to the city's real property interests. And that's an important point here, too, that, you know, in the residential context that Judge Rakoff mentioned, surely a property owner wouldn't have to wait for years while a piece of litigation went on to keep his neighbor from parking in his front yard. You know, interests are aesthetic, they're privacy, they're safety, perhaps. The city, even though a public entity, has very much as compelling interests in controlling his real estate as owner of a house. The city's interests are different, but they are, we need to regulate the operations here, we need to control safety here, we need to control traffic flow, and those interests, those are, it's real property interests here, but they're every bit as compelling as the, you know, as the neighbor who's decided for whatever reason wants to park his car. Okay, but parking the car, you could also show that then they couldn't park their car, it's unsightly and all that. But what if I just, like, kind of walked on the lawn a little bit off the sidewalk? Could they get an injunction against me for that? I mean, that would technically be a trespass, and you could convict me of that, but could you get an injunction for me never actually stepping off the sidewalk a little bit? In the residential context? Well, I suppose that's a somewhat harder case. I think, I would absolutely argue that that's an assault to your property right for which money damages aren't adequate to compensate it. Presumably the analogy would be, if you walked on my lawn 42,000 times without my permission, could I get an injunction against you? Yes. And there are lots of other people lawfully on my lawn, and you're interfering with them. I suppose that would be, that's how I would... What if I walked on your lawn one time? Could you get an injunction? That is a harder case, Your Honor. But in a funny way, it mirrors a little bit what happened here. Maybe Turo walked on the lawn once in 2016. Boy, their business has taken off since then. And it looks like in 2019, it was closer to 100,000 times. At some point, the city has to make a decision that it's going to stop. And that's what it did when it filed its counterclaims. Can I ask a question about the conditions of the license that the city would impose if one were granted? Because that ultimately, to me, is what's going on here. It's not that Turo can't operate this business. You just don't want it to do so without paying license fees and any other conditions that would be attached to that. So are you saying that if we're in a position to force Turo to acquire a license, that you would, as one of the conditions, prohibit every single one of the trips that its host would make onto LAX property? Is that why the congestion would be reduced? Well, first of all, your honor, Turo has refused to apply for a permit. They say they're not subject to any conditions. They can pick up, drop off at the terminal, in the parking garages, wherever. So that's not a discussion that has taken place. I would agree with you, your honor, that it's really the operational restrictions that the airport imposes on these ground transportation operators that are the critical fact. There are, you know, fees are an issue, too. But it's the operational restrictions that would take place. Is there, you know, if Turo were willing to apply for a permit, because that's completely hypothetical at this point, but if they were willing to apply for a permit, you know, the airport could engage in conversation with them about what operational requirements and restrictions, you know, would be appropriate. Can I put it in these terms just to try to focus you? If you were to tell me that the only thing that would be different if you won this case is that you would make Turo pay, what is it, $6,000 a month or whatever the fee is, and that's it, and all of their operations would otherwise remain exactly the same, then I don't think you would be able to say anything about reducing congestion as part of your irreparable harm argument. I think what you need to show is that in addition to our being able to charge that licensing fee, we would be able to impose conditions that restricted their ability to come onto our property, I guess to the extent of eliminating all .13% of those trips. And that's what I guess I'm asking you. Is that the position you're taking, that yes, that is what we would in fact be doing? In fact, your Honor, there's an analogy and it's described in the complaint with something that are called the NILAs, which are off... I think his question asked for an analogy. He wants to know what the permit would look like. The permit would contain operational restrictions. And in fact, your Honor, there are operational restrictions imposed on entities that are off-airport rent-a-car providers that provide for passengers being required to take a city-owned shuttle to a remote lot and then the off-airport rent-a-car companies picking passengers up at that remote lot and driving them by bus to their facility. So that is a... I point that out as a form of a restriction that would be imposed on an entity like Turo. Again, we've never gotten there because Turo refuses to apply for a permit. Okay, thank you. I do, I guess, if I might say just one... Okay, then thank you for your argument. Okay, two minutes, Mr. Brown, and one minute, Ms. Pabian. So on the CDA 230 point, the city has really tried to recast its claims on appeal. And I just want to point the court to something in the record. This is our excerpts of record 413 to 415. There, the city asks that Turo be prohibited from doing the following things. Number one, permitting motor vehicles to be listed on Turo's website as available for pickup or drop off at LAX. Number two, facilitating in any way transactions originating and or ending at LAX. This is the city's proposed preliminary injunction order. And I want to emphasize that because however you might be able to recast your claims on appeal, however you might be able to artfully plead in your counterclaims, when the rubber hits the road and you put a proposed order in front of the district judge asking for the relief you seek, you have to be specific about it. And it's clear that the city's claims in this case go to the third party user content on the site, no doubt about it. And so that's core CDA 230 immunity right there. And of course, the court's order reflected that. It didn't use exactly the same language, but it certainly did go to third party content. And not just the preliminary injunction portion of the order at the end, but also on page 13 of our excerpts, the court there says any obligation on Turo to remove offending content could also be satisfied without changes to content posted by the website's users by, for example, eliminating an owner's ability to post a vehicle for rent at an address that falls within LAX. And so basically what the court is saying is, well, you might not have to modify any existing listings. All you have to do is exclude that content going forward and then you're fine. Well, what I would say is whenever you see language like that, it should raise a huge red flag under CDA 230, because that goes right to the core of what Turo is supposed to be immunized against liability for making decisions about whether to exclude third party content or not. Okay. Unless my colleagues have questions, you've gone in your overtime overtime. Okay. Thank you. And Ms. Pabian, one minute. Yes. Judge Callahan, you asked opposing counsel to identify evidence, any evidence of irreparable harm, and you didn't hear him refer to any particular evidence. As you also point of irreparable harm, as you also pointed out, they have to tie the traffic and congestion to our individual hosts. They did not do that. Judge Watford, you also pointed out the fact that in reality here, money damages can satisfy the city's claims. This case is not about congestion and traffic. This is about the city wanting Turo to apply for a permit and get additional revenue. If Turo had a permit, you wouldn't hear them talking at all about traffic and congestion. And lastly, as far as looking at the numbers here and restrictions, Dr. Park pointed out that in comparison to the 124 vehicles a day that Turo users operate, there are 24,000 Uber and Lyft vehicles on the LAX roadways every day, 4,500 taxis, and 4,500 limos. Certainly, 124 Turo user vehicles is nothing in comparison to any of those other ground transportation operations. Well, what does the record say about also, too, that doesn't cover the people that just come and pick people up? That's correct. So does the record say how many of those people there are? Well, in total, Dr. Park identified that in 2018, there were 96,000 average vehicles a day, including all vehicles. And so there were 33,000 at that time, 33,000 with Uber, Lyft, limos, and taxis. So presumably, the other 60-something thousand are just people that are coming there from the public with their own vehicles or something like that. But certainly, 124 Turo user vehicles is not causing any type of noticeable traffic or congestion, and certainly doesn't establish irreparable harm here. Okay, thank you. Yes, questions? No, you don't get to ask a question. No, no. You guys don't – that's not how it works. Okay, but – so do either of my colleagues have any questions? Okay, that will conclude argument. This matter is submitted. Thank you. Thank you, Your Honors.
judges: Callahan, Watford, Rakoff